O. E. KINDER, RESPONDENT, v. HEDWIG SCHLESINGER, ADMINISTRATRIX, OF THE PARTNERSHIP ESTATE OF J. & V. SCHLESINGER, BOTH DECEASED, APPELLANT.*

St. Louis Court of Appeals. Opinion filed November 2, 1926.

**1.—Executors and Administrators—Claims Against Estates—Servants—Statutes.** The word "servants" as used in section 181, Revised Statutes 1919, classifying demands against estates **held** to mean household or domestic servants and not to include a clerk who worked in the store of deceased and whose work was all in connection with the store business.

**2.—Same—Same—Wages—Second Class Claims—Statutes.** Wages, which section 181, Revised Statutes 1919, intends to be assigned to the second class of claims against estates are the wages accruing during the last sickness of the deceased.

---

*Corpus Juris-Cyc. References: Executors and Administrators, 24CJ, p. 426, n. 92; p. 427, n. 94, 98 New; Servant, 35Cyc, p. 1431, n. 34.

Appeal from the Circuit Court of Madison County.—Hon. Peter H. Huck, Judge.

REVERSED AND REMANDED (*with directions*).

*E. D. Anthony* for appellant.

*Davis & Damron* for respondent.

(1)    Appellant has failed to comply with Rule No. 18 of the rules of this court, in that he has failed to state in his brief, filed herein,

any points and authorities on which he relies for reversal of the judgments in this case. Therefore the appeal in this case should be dismissed. (2) A servant is a person employed to labor for the pleasure or interest of another; especially in law, one employed to render service or assistance in some trade or vocation, but without authority to act as agent in place of his employer. Any person who works for another for a salary, a person hired for wages to work as the employer may direct and under his control. 35 Cyc. 1430. (3) Respondent's employment, as shown by the record, made him a servant within the meaning of sec. 181, R. S. 1919, and entitled his claim to be assigned as a demand for the second class. Sec. 181, R. S. 1919; Cawood et al. v. Wolfley, 56 Kas. 281. (4) It is the legislative policy of the State of Missouri, as well as other states, to prefer claims for wages over claims of general creditors. Secs. 181, 1619, R. S. 1919; 18 Cyc., p. 552; Cawood et al. v. Wolfley, 43 Pac. Rep. 236; Sec. 8458, Penn. Statutes Complete to 1920; Sec. 80, ch. 37, Kas. Statute.

SUTTON, C.—This action is on a demand for balance due on salary, presented in the probate court of Madison county. The cause was appealed from the probate court to the circuit court, where, upon trial anew, before the court, without a jury, the court gave judgment in favor of plaintiff for $468.72, and assigned the same to the second class of demands. From this judgment the defendant has brought the case here by appeal.

The only controversy upon this appeal relates to the classification of the demand. The defendant contends that the demand should have been assigned to the fifth class, whereas plaintiff contends that it was properly assigned to the second class.

It appears that Joe Schlesinger and Val Schlesinger, who were brothers, were engaged as partners in the mercantile business in Fredericktown for many years. The plaintiff was in their employ as a clerk in their store for about twenty years. As clerk he did anything there was to be done around the store. Joe Schlesinger died several years before the death of Val Schlesinger. After the death of Joe Schlesinger, Val Schlesinger continued the partnership business in the name of the partnership as before. During the last four or five years of his life, Val Schlesinger was in ill health. It seems that he was afflicted with several diseases, the nature of which does not appear. The condition of his health, however, was not such as to prevent him from giving attention to his business. He was at the store every day until the day before he died. It seems that in going to and fro between his home and the store, he sometimes walked and sometimes drove an automobile. He was subject to some kind of spells, a hurting in the chest, and sometimes when walking from his home to the store, on arriving near the store, he would be seized with

one of these spells, and the plaintiff on such occasions would assist him into the store and let him sit down in a chair for a few minutes, and he would get all right. Sometimes plaintiff would help him to put on his coat or overcoat when he was leaving the store to go to his home or to his meals, and would assist him to his automobile in case he was suffering from one of the spells to which he was subject, but he did not go to his home with him, and he never worked at his home as a servant. His work was all in connection with the store business. Just what period of time is covered by the demand in suit does not appear. The first item of the demand is dated May 1, 1923, and charges the estate with a balance due on salary of $309.70. On July 21, 1924, there is a charge for interest on this balance of $22.71. On the same date there is a charge for salary from May 1, 1923, to July 20, 1924, of $733.33. The total charges amount to $1065.74. Credits are given of various dates from May 1st to July 19, 1924, which amount in the aggregate to $597.02, leaving a balance due on the demand of $468.72.

Section 181, Revised Statutes 1919, provides as follows:

"All demands against the estate of any deceased person shall be divided into the following classes:

"I. Funeral expenses.

"II. Expenses of the last sickness, wages of servants and demands for medicine and medical attendance during the last sickness of deceased; . . .

"III. All debts, including taxes due the State or any county or incorporated city or town; . . .

"IV. Judgments rendered against the deceased in his lifetime, and judgments rendered upon attachments levied upon property of the deceased during his lifetime; . . .

"V. All demands, without regard to quality, which shall be legally exhibited against the estate within six months after the date of the granting of the first letters of the estate.

"VI. All demands thus exhibited after the end of six months and within one year after the date of the granting of the first letters on the estate."

The provisions of this section relating to the second class of demands as above set out, though appearing in the statute books in substantially the same language for more than a century, have never been construed or discussed by the courts of last resort in this State. The defendant insists that the word "servants" as used in the statute means servants as popularly understood, and includes only household or domestic servants, and that only the wages of such servants accruing during the last sickness of deceased are included in the second class of demands. Plaintiff insists that the word "servants" as used in the statute must be understood in its legal sense, and in-

cludes persons employed in the decedent's business, as well as domestic servants, and that the wages of such employees are included in the second class of demands, whether accruing during the last sickness of the deceased or otherwise. The assignment to the second class of a demand for wages against a partnership estate could hardly be urged on any other theory.

A statute similar to our own was enacted in Pennsylvania in 1794. It placed the following demands in the first class: "Funeral expenses, medicines and medical attendance given during the last illness of the decedent, and servant's wages, not exceeding one year." The statute was construed by the Supreme Court of Pennsylvania in 1812, in *Ex parte* Meason and another, administrators of Ashman, 5 Binn. (Pa.), 167, which was an appeal from the Orphan's Court of Fayette county. In that case it was sought to have the claims of workmen who were employed by the intestate in manufacturing iron and in the business incident thereto, treated as servants' wages and as such assigned to the first class. In the opinion of the president of the district and the decree of the Orphan's Court, which was approved by the Supreme Court, it was said:

"In respect to the second point, there seems to be considerable difficulty in determining what class of persons were intended by the Legislature to be comprehended in the description of 'servants,' to whom this extraordinary preference is given, that their claims should rank in the first class, with physic and funeral expenses.

"The word 'servant,' in its legal acceptation has a very comprehensive import: It not only applies to domestics, but to a variety of other persons, who are employed by any one to do service for him. . . .

"Now by the act of 1794, debts due to the public, which theretofore constituted the second class, were placed in the *last;* it being, probably, conceived that if a loss must be sustained, it were better it should be borne by the community at large, than by an individual.

"By the same act, *physic* and *'servant's wages'* are brought into the first class, with funeral expenses. Why was this done? Is it not presumable that this was done with a view to encourage, promote and reward those engaged in discharging the necessary offices of humanity, towards persons languishing on the bed of sickness? If the advice and assistance of physicians are necessary to the sick, the services of nurses and other attendants are no less so. It was then wise, perhaps, to adopt a regulation, which, by securing the wages of domestics, might prevent them from abandoning the house of their expiring master, at the moment when their services might be most essential. . . .

"There ought to be strong ground for giving a preference to any one class of creditors over another. The party who claims it, ought

to show that he is strictly entitled to it; especially if there be no equity discoverable in the claim. Now, to my mind it appears, that there is not a *scintilla* of equity in the claim of these *labourers*, to have the demands of other creditors postponed to theirs.''

On appeal to the Supreme Court, Chief Justice Tilghman said:

''Another point is made on this appeal, which does not admit of so easy a solution. The act of assembly gives a preference to *servants' wages*. The intestate Mr. Ashman was concerned in iron works, and the persons employed in these works claim a preference as *servants*. The term *servants,* in its largest extent, is very comprehensive. It includes not only all those employed by another to do any kind of work or labour, but even agents in mercantile and other branches of business, in which bodily labour is not exerted. It has not been contended that the act of assembly is to be construed in the utmost extent. We must therefore seek for some more limited and reasonable sense. I know none so proper as the common understanding of the country, which seems to confine servants to that class of persons who make part of a man's family, whose employment is about the house or its appurtenances, such as the stable, etc., or who, residing in the house, are at the command of the master, to be employed at his pleasure, either in the house or elsewhere. . . . It is not to be forgotten, that although this act gives some preferences in payment, yet there is an evident intent pervading it, to lessen the number of these preferences, and to introduce equality as far as justice and convenience would permit. There is a great variety of persons employed in iron works, managers, colliers, wood-cutters, waggoners and those whose business is out of doors, besides a numerous tribe engaged in melting, casting, and forging within. Of those persons the wages are different. Some are paid by the year, month, or week, and some by the job or piece, but all are unconnected with the domestic scene; all may be properly called workmen, and none are commonly called servants. I am therefore of opinion, that the Orphan's Court were right in denying them a preference, and that the decree should be affirmed.''

Justice Yeates said: ''The great difficulty of this case, is to affix a correct and precise meaning to the words *servants' wages* in this law. Upon all hands it is agreed, that they cannot be confined to slaves, or indented servants, who are not entitled to wages; and that they cannot be extended to the relation of master and servant in the general legal sense of those terms, where one acts under the direction or command of another, because no reasonable ground of preference can be assigned to the character of servants in such large and comprehensive acceptation. . . .

''I am then satisfied on the fullest reflection that the word *servant,* used in the 14th section of the act of the 19th of April, 1794, must

be restricted to its common and usual sense, as understood by house-holders. It signifies a hireling, one employed for money to assist in the economy of a family, or in some other matters connected there-with. I count it of no moment that the party hired does not sleep or eat within the walls of the house. I denominate a gardener, coach-man, footman, etc., who lives out of the family, as servants within the true meaning of the act. Not so of a clerk or bookkeeper, who, however meritorious his services might be, would scorn to be placed in the rank of servitude. Nor can I conceive the smallest propriety in calling those persons who were employed by James Ashman in his lifetime in the manufacture of iron and business incident thereto, *servants,* and therefore entitled to a preference as such.''

The Supreme Court of Kansas has taken a different view in con-struing a statute similar to ours, but differing in some respects, in Cawood v. Wolfley, 56 Kan. 281, but we prefer the view expressed by the Pennsylvania courts, which is in better accord with the manifest purpose and spirit of our statute. It does not seem reasonable that our statute intends that the wages of all servants within the compre-hensive meaning of ''servants'' in the legal acceptation of the term, or as the term is understood in the law of master and servant, with-out any limitation of the period of time covered by the accrument of such wages, should have the same rank and be prorated with ex-penses of the last sickness, demands for medicines and medical at-tendance, nursing, and the various ministrations of servants in the household, during the last sickness of the deceased. We think the statute intends the term ''servants'' to be understood in its popular acceptation, and that the wages which the statute intends to be as-signed to the second class are the wages accruing during the last sickness of the deceased.

Plaintiff says that it is the legislative policy of this State, as shown by section 1619, Revised Statutes 1919, to prefer the claims of all wage earners, without regard to any particular class to which they may belong, over the claims of general creditors, and urges this in aid of his view regarding the construction of section 181. But we think the provisions of that section militate against, rather than aid, the plaintiff's view, for that section limits the claims of the wage earners therein preferred to one hundred dollars, and limits the period of time covered by the accrument of such wages to six months.

We conclude that the learned trial court erred in ordering the plaintiff's demand assigned to the second class.

The Commissioner therefore recommends that the order of the court assigning the plaintiff's demand to the second class be reversed and the cause remanded, with directions to the court to order said demand assigned to the fifth class.

PER CURIAM:—The foregoing opinion of Sutton, C., is adopted as the opinion of the court. The order of the circuit court assigning the plaintiff's demand to the second class is accordingly reversed and the cause remanded, with directions to the court to order said demand assigned to the fifth class. *Daues, P. J.,* and *Becker* and *Nipper, JJ.,* concur.